UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY L. KROH, Administrator of the Estate of April M. Erdman, | : | **CIVIL NO: 1:CV-07-0686** |
| | : | (Judge Conner) |
| Plaintiff | : | (Magistrate Judge Smyser) |
| v. | : | |
| NORFOLK SOUTHERN RAILWAY COMPANY and NORFOLK SOUTHERN CORPORATION, | : | |
| Defendants | : | |

**REPORT AND RECOMMENDATION**

I. Background and Procedural History.

The plaintiff, the Administrator of the Estate of April M. Erdman, commenced this action by filing a Praecipe for a Writ of Summons in the Court of Common Pleas of Northumberland County, Pennsylvania. On April 12, 2007, the defendants, Norfolk Southern Railway Company and Norfolk Southern Corporation, removed the case to this court.

On May 21, 2007, the plaintiff filed a complaint, and on July 6, 2007, the plaintiff filed an amended complaint.

The amended complaint contains two counts. Count I is a wrongful death claim under Pennsylvania law. Count II is a

survival action under Pennsylvania law. The plaintiff's claims arise from the death of April Erdman on October 28, 2005 after the vehicle she was driving was involved in a collision with a train owned by the defendants.

The plaintiff alleges in the amended complaint that the defendants were negligent by: operating the train at an unreasonably high rate of speed under the circumstances including the location and condition of the track and surrounding trees and brush, failing to slow or stop the train in order to avoid a collision, permitting a dangerous intersection to exist, failing to warn of a dangerous intersection, failing to give timely and adequate warning of the train traveling in the area of the accident, failing to maintain the intersection in a reasonable manner to provide better visibility.

On September 11, 2007, the defendants filed an answer to the complaint.

Pursuant to the Amended Case Management Order filed on January 28, 2008, the discovery period ended on April 30, 2008.

On June 13, 2008, the defendants filed a motion for summary judgment, a statement of undisputed facts, a brief and documents in support of the motion. After requesting and receiving extensions of time, on July 8, 2008, the plaintiff filed a response, a brief in opposition and documents in

opposition to the defendants' motion for summary judgment. On July 10, 2008, the plaintiff filed a response to the defendants' statement of undisputed facts. On July 22, 2008, the defendants filed a reply brief in support of their motion for summary judgment.

In this Report and Recommendation, we address the defendants' motion for summary judgment.[1]

II. Summary Judgment Standard.

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

A material factual dispute is a dispute as to a factual issue that will affect the outcome of the trial under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

---

1. Also pending are two motions *in limine* and a *Daubert* motion. Since those types of motions are usually addressed by the trial judge, we will not address those motions unless directed to do so by Judge Conner.

Summary judgment will not lie if there is a genuine dispute about a material fact. *Id.* at 248. An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson, supra,* 477 U.S. at 249-50. In determining whether a genuine issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson, supra,* 477 U.S. at 249. The proper inquiry of the court in connection with a motion for summary judgement "is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

III. Undisputed Facts.

The following facts are not in dispute for purposes of the defendants' motion for summary judgment.

The accident in this case occurred at approximately 3:15 p.m. on October 28, 2005 in the town of Dalmatia, Northumberland County, Pennsylvania. *Doc. 38 at ¶1 and Doc. 51 at ¶1.* At the time of the accident, April Erdman was the owner and operator of a 1989 Mercury Tracer and was operating that car east across a crossing that intersects with railroad tracks. *Id. at ¶2.*

The crossing was not maintained, owned or possessed by a municipality. *Id. at ¶*3. The crossing provided ingress and egress to private land which the railroad tracks crossed. *Id.* The land beyond Norfolk Southern's right of way on the west side of the tracks was owned and possessed by private landowners. *Id. at ¶*6. At the time of the accident, on each side of the crossing, there was a stop sign and a sign indicating a private railroad crossing and directing those crossing to "look" with an arrow in both directions. *Id. at ¶8 and Doc. 37 at pp. 29 & 30.*

At the time of the accident, Erdman was familiar with the crossing by having crossed it numerous times and she knew that trains regularly traveled through Dalmatia in a northernly direction at no set times. *Doc. 38 at ¶7 and Doc. 51 at ¶7.*

Prior to the accident, Erdman had been helping her boyfriend, Daniel Maurer, remove belongings from a home located on the west side of the tracks. *Id. at* ¶9. After the belonging were loaded in her car, Erdman backed up parallel to the tracks for some distance and then towards the Susquehanna River. *Id. at* ¶10. She then placed the car in drive to cross the tracks. *Id.* At the time, a Norfolk Southern train was heading north on the tracks. *Id. at* ¶4.

Erdman's vehicle was stuck by the train and came to rest north and west of the crossing. *Id. at* ¶12. Erdman was ejected from the vehicle and died as a result of the injuries she sustained in the collision. *Id. at* ¶13.

At the time of the collision, Daniel Maurer was a passenger in the front seat of Erdman's car. *Id. at* ¶14. He testified during his deposition that to the best of his knowledge he did not see Erdman look south or north along the tracks. *Doc. 37 at 23.*

The track upon which the train was traveling is classified pursuant to federal regulations as Class 4 Track with a maximum allowable speed of 60 miles per hour. *Id. at* ¶18. The railroad established speed at the accident site was 50 miles per hour. *Id. at* ¶22. At the time of the accident, the train was traveling 50 miles per hour. *Id. at* ¶20. A train traveling 50 miles per hour travels 73.3 feet per second. *Id. at* ¶21.

At the time of the collision, the lead locomotive of the train was equipped with what is known as a RailView, which is a digital recording device looking forward from the locomotive windshield which records video and other information such as speed and horn activation. *Id. at* ¶15.

IV. Discussion.

A. Excessive Speed Claim.

The plaintiff claims that the defendants were negligent in operating the train at an unreasonably high rate of speed under the circumstances including the location and condition of the track and surrounding trees and brush. The defendants contend that they are entitled to summary judgment on that excessive speed claim on the basis of federal preemption.

The Federal Railroad Safety Act (FRSA) contains a preemption provision which provides in pertinent part:

> **(a) National uniformity of regulation.** (1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.
>
> (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with

> respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--
> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;
> (B) is not incompatible with a law, regulation, or order of the United States Government; and
> (C) does not unreasonably burden interstate commerce.

49 U.S.C.S. § 20106(a).

The Secretary of Transportation has issued federal regulations pursuant to FRSA setting "maximum allowable operating speeds for all freight and passenger trains for each class of track on which they travel." *CSX Transportation, Inc. V. Easterwood,* 507 U.S. 658, 673 (1993). The federal regulations addressing maximum speeds cover "the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Id.* at 675.

It is undisputed that the track at issue in this case is classified pursuant to federal regulations as Class 4 Track with a maximum allowable speed of 60 miles per hour and that, at the time of the accident, the train in this case was traveling 50 miles per hour. Accordingly, the plaintiff's excessive speed claim is preempted by 49 U.S.C.S. § 20106(a). See *CSX, supra,* 507 U.S. at 673-75 (holding that common law excessive speed claim preempted in case where train was

traveling less than the maximum speed set by the federal regulations).

The plaintiff intimates that his excessive speed claim fits within the savings clause of § 20106(a) for laws necessary to eliminate or reduce an essentially local safety hazard due to overgrown trees and brush around the track and the condition of the crossing. However, overgrown trees and brush and the condition of a crossing have been held not to be local hazards since such conditions exist at many crossings. *See e.g. Steva v. Soo Line Railroad Co.,* No. 96-4198NI, 1997 WL 381854 at *1 (8th Cir. 1997)(holding that high volume of traffic, lack of active warning device, grade and angle of crossing, and surrounding vegetation are conditions commonly found at crossings which can be adequately addressed within uniform, national standards and therefore are not specific individual hazards). Accordingly, the plaintiff's excessive speed claim does not fit within the savings clause of § 20106(a), and the defendants are entitled to summary judgment on the plaintiff's excessive speed claim.

In addition to claiming that the defendants were negligent in operating the train at an unreasonably high rate of speed under the circumstances, the plaintiff claims that the defendants were negligent in failing to slow or stop the train in order to avoid the collision. It appears that the defendants are also seeking summary judgment on this claim on the basis of federal preemption. *See Doc. 36 at 4.*

To the extent that the plaintiff's claim of failing to slow or stop the train is merely a claim that the defendants failed to slow or stop the train in light of the general conditions at or approaching the crossing, it is merely another way of saying that the train was traveling at an unreasonably high rate of speed under the circumstances and, as discussed above, such a claim is preempted. However, to the extent that the plaintiff's claim of failing to slow or stop the train is a claim that the defendants failed to slow or stop the train after they saw Erdman's car approaching or on the tracks, that claim is not preempted because a car on the tracks or approaching the tracks without stopping is a local safety hazard that falls within the savings clause of § 20106(a). *See Shaup v. Frederickson*, No. CIV A. 97-7260, 1998 WL 726650 at *12 (E.D. Pa. Oct. 16, 1998)(holding that claim that train operator failed to slow or stop the train to avoid colliding with car on tracks is not preempted by federal law); *Alcorn v. Union Pacific Railroad Co.*, 50 S.W. 3d 226, 242 (Mo. 2001)(holding that claim that train failed to slow down or stop upon the unwavering approach of a vehicle toward the crossing is not preempted because an unwavering approach of a vehicle constitutes a specific, individual hazard).

B. Horn Claim.

The plaintiff claims that the defendants were negligent in failing to give timely and adequate warning of the train

traveling in the area of the accident. The parties have briefed this as a claim that the defendants were negligent in failing to sound the horn on the train earlier than the train crew sounded the horn.

The defendants contend that it is undisputed that the engineer blew the horn once Erdman's car came into his view and he perceived the car not to be stopping.

The defendants have submitted frames from the RailView. *Doc. 37 at 78-93.* The defendants contend that the RailView frames show that the horn was activated as soon as Erdman's vehicle came into view. *See Doc. 52 at 8.* The plaintiff contends that, without viewing the actual RailView video, the frames do not give an accurate representation of how the accident occurred. *Doc. 51 at ¶16.* The Railview frames submitted to the Court are somewhat blurry.[2] We can not as a matter of law in the summary judgment context rely on the Railview frames to conclude that the horn was activated as soon as Erdman's vehicle came into view.

The engineer of the train, Christopher L. Farberman, testified as follows about how the accident happened:

> A. All I can say, we rounded a left-hand curve, on a straight for a while, and noticed

---

2. The Railview frames submitted electronically are dark and blurry. The defendants submitted hard copies of the Railview frames which are not as dark and blurry. However, those hard copies are still somewhat blurry.

> a car approaching the crossing. Then - I mean, do you want specifics of what I did?
> Q. Yes, yes, then what happened?
> A. We noticed it. The car approached the crossing really slow, appearing to stop - appearing that it was going to stop. When it didn't, I started blowing the whistle and applying the brakes.
> Q. Then what happened?
> A. Then the impact happened.

*Doc. 48-4 at 5 (deposition page numbered 64).* The plaintiff cites that testimony as evidence that the engineer waited to sound the horn until the vehicle was already on the tracks. The plaintiff contends that the train's horn should have been sounded when Erdman's vehicle first came into sight. The plaintiff also contends that the horn should have been sounded as the train approached the crossing.

The defendants contend that since the crossing in this case was a private crossing[3], rather than a public crossing, the duty to sound the horn arose only once the dangerous situation at the crossing was perceived by the crew and that the defendants complied with their duty.

"[T]he high degree of care as to signaling and speed required of an electric railway at a public crossing is not

---

3. In response to paragraph 2 of the defendants' Statement of Undisputed Facts, the plaintiff admits that Erdman was operating the car "east across a private crossing that intersects with railroad tracks." *Doc. 38 at ¶2 and Doc. 51 at ¶2.* However, the plaintiff later denies that the crossing was a private crossing. *Doc. 38 at ¶¶3 & 4 and Doc. 51 at ¶¶3 & 4.* The plaintiff has not presented any evidence that the crossing was not a private crossing.

always required at a private crossing, where the danger of injury is less." *King v. Pittsburgh H.B. & N.C. Ry Co.*, 89 A. 577, 577 (Pa. 1914). "But the duty of care does not rest wholly upon a person using the crossing, and the railway company is bound to the exercise of care commensurate with the danger of the particular situation." *Id.* Although warning of the approach of a train may not be required at every private crossing, "it cannot be said warning is unnecessary where . . . the view is short or obstructed." *Kuhns v. Conestoga Traction Co.*, 138 A. 838, 840 (Pa. 1927).

In this case, where the plaintiff claims that the view at the crossing was obstructed by vegetation and that the crew failed to sound that horn until the car was on the tracks, it is for the trier of fact to determine whether the defendants were negligent by not sounding the horn earlier than they did.

C. Vegetation Claim.

The plaintiff contends that the defendants were negligent in failing to maintain the intersection in a reasonable manner to provide better visibility. The plaintiff has presented evidence that the view of the track from the crossing was partially obstructed by vegetation. *Doc. 48-4 at 8 (Accident Report)*, *Doc. 48-5 at 4 (Maurer Dep. p. 24) and Doc. 48-12 at 6 (Faulk Report at p.5).*

The defendants contend that they are entitled to summary judgment on the vegetation claim because the plaintiff has not produced evidence that the vegetation at issue was located on its property and that it did not have a legal right or duty to control the vegetation. This argument is without merit.

The defendants may not have had the legal right to simply go onto private property beyond their right-of-way to clear vegetation without the permission of the property owner. However, that does not mean that it was reasonable for the defendants to do nothing about vegetation obstructing the view from a crossing. The defendants' own procedures provide:

> Note: If an obstruction is located off the right-of-way, the owners of the land containing the obstruction should be contacted personally and an appeal made to the landowners to remove the obstruction. The personal contact should be followed up with a letter, with a copy to the appropriate state agency. If the landowner asks for NS' assistance in removal of the obstruction, we should respond promptly and appropriately. If the landowner refuses to remove the obstruction, then the matter should be referred to the Law Department for guidance.

*Doc. 48-13 at 22 and Doc. 48-15 at 6.*

The defendants are not entitled to summary judgment on the plaintiff's vegetation claim.

D. Negligence of Erdman.

The defendants contend that they are entitled to summary judgment because Erdman was negligent by failing to stop, look and listen before crossing the tracks and that her negligence was greater than 50% thereby barring recovery by the plaintiff.

"A traveler's failure to stop, look and listen before crossing a railroad track ordinarily 'constitutes contributory negligence as a matter of law' in Pennsylvania" *Bouchard v. CSX Transportation, Inc.,* 196 Fed.Appx. 65, 68-69 (3d Cir. 2006)(quoting *Tomasek v. Monongahela Ry. Co.*, 235 A.2d 359, 362 (1967)). The traveler's obligation to stop, look and listen continues as she crosses the track. *Id.* at 69. Because comparative negligence on the part of the plaintiff is a defense, the defendants bear the burden of proving that the plaintiff did not stop, look or listen. *Id.* "Under Pennsylvania's comparative negligence statute, a plaintiff's negligence bars recovery only when it is greater than that of the defendant." *Id.* at 70 (citing 42 Pa.Cons.Stat.Ann. § 7102). "Comparative negligence is ordinarily an issue for the jury; it is a 'rare situation where it can be said that the plaintiff is more than 50% negligent as a matter of law.'" *Id.* (quoting *Gilbert v. Consol. Rail Corp.,* 623 A.2d 873, 876 (Pa.Commw.Ct. 1993)).

The defendants contend that it is undisputed that Erdman failed to stop and look before proceeding across the tracks. They cite the deposition testimony of Daniel Maurer, the passenger in the car. Maurer testified:

> Q. As she was backing up and you're getting ready to pull across the crossing, were you talking anything like what you were going to do, where you were going to go?
> A. No.
> Q. So she backed up, and there was a concrete slab you said?
> A. Yes. It's kind of like a very poorly made concrete slab.
> Q. And then she began to pull up across the crossing; correct?
> A. Yes.
> Q. As she pulled up to the crossing until the time of the impact, did the car ever stop?
> A. No.
> Q. Did you ever see her stop at any point and look south or north along the tracks?
> A. No, to the best of my knowledge.
> Q. All of these questions are based on the best of your knowledge.
> A. Okay.
> Q. Did you hear any sounds the indicated to you there was a train coming?
> A. No, I didn't. My right eye was still swelled shut from the first accident. The whole right side of my face was still out to here. And I couldn't even see out of my peripheral vision or anything. Who knows? I might have been sitting there blocking her sight from seeing it.
> And in these pictures - maybe they are there. There was a line of bushes coming from this house that kind of blocked the tracks. They stand - they're high trees, probably ten-foot high or more. And they ran along the tracks up to there. Which I remember for myself crossing the tracks years ago, because I was real good friends with this guy, it was hard to see a train coming from that direction with the bushes right there in the way.

*Doc. 48-5 at 4 (Maurer Dep. at pp. 23-24).*

The plaintiff argues that Maurer's testimony demonstrates that the car stopped at the stop sign before proceeding forward across the tracks because the car would have had to have stopped after backing up so that the car could be put in drive. The plaintiff also argues that the defendants have not established that Maurer was even watching Erdman when she began to move forward from the stop sign.

Given that Maurer's testimony is not necessarily inconsistent with Erdman stopping at some point, and given the indefiniteness of his testimony regarding her failure to look combined with plaintiff's evidence that the view of the tracks from the crossing was partially obstructed by vegetation it is for the trier of fact to determine whether Erdman was negligent and, if so, whether her negligence exceeded any negligence on the part of the defendants. Accordingly, the defendants are not entitled to summary judgment on the basis of negligence on the part of Erdman.

## V. Recommendations.

Based on the foregoing, it is recommended that the defendants' motion (doc. 35) for summary judgment be granted in part and denied in part. It is recommended that the defendants be granted summary judgment on the plaintiff's claim that the defendants were negligent in operating the train at an unreasonably high rate of speed under the circumstances. It is

recommended that the motion for summary judgment be denied in all other respects.

***/s/ J. Andrew Smyser***
J. Andrew Smyser
Magistrate Judge

Dated: September 8, 2008.